HARDIE C. CUNNINGHAM, plaintiff in error, *vs.* DAVID L. CAMPBELL, *et al.* defendants in error.

1. The Congress of the Confederate States have the power, under the Constitution, to authorize and direct, by statute, the accumulation of supplies for the future use of the army, by impressment, whenever they cannot be procured at fair prices by purchase ; *provided*, that, by the same statute, provision be made for prompt and just compensation.
2. The scheme provided for assessing compensation in the fifth section of "an Act to regulate impressments," passed 26th March, 1863, is not in compliance with the limitation of the power in the last clause, sixteenth paragraph, ninth section, first article of the Constitution.   And proof that compensation was tendered as assessed, in a schedule previously made by commissioners, according to said fifth section of the Act, is not sufficient evidence of a tender of just compensation.
3. In such a case, in the absence of other evidence that the price tendered *was* "just compensation ;" and especially (as in this case) with proof that it was not so, the impressment cannot be sustained.
4. In case of disagreement between the impressing officer and the owner, just compensation should be ascertained by the appraisement of the property impressed, at the time and place of impressment by appraisers, fairly and impartially appointed.
5. Where private property has been impressed, under a statute which does not make provision for just compensation, the officer will be held to have taken it by violence, without lawful warrant or authority, and a proceeding by possessory warrant under the 3932d section of the Code of Georgia, is an appropriate and adequate remedy.

Possessory Warrant, decided by Judge LOCHRANE, 1st September, 1863.

The statement of the case will appear in the opinion of the Court.

E. A. NISBET and A. IVERSON, for plaintiff in error.

C. B. COLE and B. HILL, for defendants in error.

*By the Court.*—JENKINS, J., delivering the opinion.

❦ At Macon, on or about the 1st day of June, 1863, H. C. Cunningham, Assistant Commissary of the Confederate States for the District of Georgia, seized certain parcels of sugar, severally owned and possessed by Collins & Lewis, Singleton

& Collins, and David L. Campbell, under an Act passed by the Congress of the Confederate States, to regulate impressments. Compensation for said sugars was tendered by the impressing officer to the owners, at the price of seventy-five cents per pound, specified in a schedule arranged and published in advance by commissioners appointed for the State of Georgia under the 5th section of the Act, and declined. About the 1st of September following, these parties applied for and obtained from the Hon. O. A. Lochrane, Judge of the Superior Courts of the Macon District, possessory warrants, under sections 3932 to 3939 inclusive, of the Code. These warrants having been executed by bringing before Judge Lochrane the said Cunningham and the property so seized, it was agreed that the cases be considered together, and disposed of by one judgment. In the response of Cunningham, his official character, the authority under which he acted, the regular appointment of the commissioners, and their adoption and publication of the schedule, to which he referred, were averred, and were admitted by the other party. He also plead to the jurisdiction of the Court, under and by virtue of this statutory proceeding.

It was admitted that the owners of the sugars had offered to sell them to the Commissary at market prices, and proven that they had paid for the same $1 00 per pound, and that they were worth $1 20 to $1 25 per pound when seized. After argument his Honor ordered that the sugars be restored to the possession of the movants, unless the Government assess the price of and pay for them according to the first and second sections of the Act, and the defendant excepted.

Before proceeding to consider the questions essentially involving the merits of the case, I must endeavor to disencumber it of some considerations which the able counsel have urged with great force and ingenuity. Much has been said of "*necessity*," of "*urgent necessity*," of a law older than and superior to the Constitution, styled the "*salus populi.*" Labored efforts have been made to prove on the one hand that this is, and on the other that it is not, a case of urgent necessity; on the one hand that the seizure was, and on the

Cunningham *vs.* Campbell *et al.*

other that it was not made in virtue of that unwritten
"*suprema lex.*" I remark, first, that *inexorable necessity*
is the corner stone of the supreme law, here characterized
as above all written constitutions, recognized and obeyed,
because without it there is no safety for the people. This
necessity is everywhere, and at all times a creature of the
present, is never discovered by provision, but looms up and
asserts itself in the inevitable *now*. It discloses present evil
menacing the body politic, and demands a present and sure
remedy. The proceedure, of which the defendants in error
complained in the Court below, is the result of forecast,
intended to provide for the future foreseen wants. This ap-
pears from the facts : 1st, that the identical course prescribed
to accumulate supples for the army in magazines, posts and
depots, was pursued. The second paragraph, second section
of General Orders No. 37, issued by the Adjutant and Inspec-
tor General, April 6, 1863, is in these words : "Impress-
ments may be made under orders from Generals commanding
armies, departments, corps, divisions, brigades, and by com-
manders of detached parties and posts, *when a necessity arises*,
which orders may be executed by quartermasters, commissa-
ries, etc., for their respective departments." Here we have
an army regulation providing for cases of urgent necessity.

The paragraph concludes in these words : "The Quarter-
master General, Commissary General and Surgeon General
may designate the officers and persons who shall be compe-
tent to make impressments, to accumulate supplies at posts
and depots." It does not appear that the seizures in this
case were made by order of any General commanding an
army, a department, corps, division, brigade, or detached
party or post. We are, therefore, unauthorized to assume
that they were made to meet an immediate necessity. The
order came from the Chief Commissary in the district of
Georgia, who acts in direct subordination to the Commissary
General, under whose direction impressments to accumulate
supplies are made. The correctness of this view appears,
secondly, from the fact that these sugars were neither con-
sumed nor removed in the interval between the seizure and

Cunningham *vs.* Campbell *et al.*

the date of the warrants, a period of three months. This, then, was not a case of "*extreme necessity*," inducing and justifying action upon the principle "*salus populi, suprema lex.*" It was a proceeding authorized by statute, for which conformity to a written constitution is claimed.

Again, I remark, that the word *necessity* does not occur in the clause of the Constitution conferring or recognizing the power of impressment. The 16th paragraph, 9th section, 1st article, after providing sundry safeguards to personal rights, concludes thus: "*nor shall private property be taken for public use, without just compensation.*" It is not, "nor shall private property be taken *to meet a public necessity, but for public use,*" etc.

It is under this clause of the Constitution, or similar clauses in the Constitution of the several States, that in our day authority is claimed to appropriate property for the construction of public highways, railroads and bridges, and the opening of streets. I by no means intend to say that it did not pre-exist in the States, nor that it is not a power inherent in all governments. My position is, that by unavoidable implication it is here granted with a condition annexed. It is very clear that when applied to the objects above enumerated, and many others of like character, the exercise of the power cannot be justified upon the plea of *necessity*. These purposes are not analogous to the repulsion of an invading army, the stay of pestilence, or the arrest of conflagration—instances usually employed to illustrate the idea of great public necessity. They are intended not to prevent public loss, but to promote public gain—not to avert public calamity, but to advance public improvement. Hence we learn that all cases of justifiable seizure of private property are not reducible to stern necessity, very many of them being found, by severe analysis, to rest on no higher sanction than public utility. So numerous and so concurrent are the authorities in support of such seizures, that it would be a waste of time to cite them.

I refer to but two, which are controlling with this Court, and in one of which the distinction between cases of necessi-

Cunningham *vs.* Campbell *et al.*

ty and those of utility is taken.   In Parham vs. The Justices, etc., 9th Georgia 341, on page 348, 349, this Court said: "It is not to be doubted that there are cases in which private property may be taken for public use, without the consent of the owner, and without compensation, and without any provision of law for making compensation; these are cases of urgent public necessity, which no law has anticipated, and which cannot await the action of the Legislature.   These cases illustrate the maxim, '*salus populi, suprema lex.*'   This rule of necessity has a very narrow application, and is an exception indeed, to the general rule, which is, that when public necessity or utility requires the assumption of private property, it can only be done by the Act of the Legislature, and the Legislature must make provision for compensation. If it does not the Courts may pronounce the law a nullity."

And in Cox & Hill vs. Cummings, (yet unpublished) we held :  "It is obvious that Congress can pass no law depriving the owner of his property, even for public use, unless adequate compensation is secured by the law."   And again : "It is the duty of the Government to provide some fair and proper mode to ascertain the value of the property taken. And to pay for it without delay.   The citizen may be compelled to submit to this encroachment upon his private rights when the public good requires it.   But whenever he is forced to make the surrender he is entitled to the value of the property taken at the time it is taken," etc.

Thus we see further it is the settled doctrine of this Court, that when the Congress of the Confederate States enact a law, authorizing the seizure of private property for public use, they will be presumed to proceed under the clause of the Constitution above quoted, and should be held to the observance of the condition, viz: a provision for "just compensation." It would seem to me that whatever may be said of the existence of the power to seize, independently of this clause, there can be no question as to the limitation thus placed upon its exercise.   Indeed, the terms in which this clause is expressed, are adapted rather to limiting an inherent or preexisting power, than to an original grant of it.   To the latter,

language such as this would have been more appropriate: "private property may be taken for public use, and just compensation therefor shall be made." Hence, in treating of this clause as a grant of power, Courts usually say it is so by necessary or unavoidable implication. Be that as it may, there is the clear, positive prohibition, "private property shall not be taken for public use *without just compensation.*" Chancellor Kent in his Commentaries, says: "A provision for compensation is a *necessary attendant* on the due and constitutional exercise of the power of the lawgiver to deprive an individual of his property without his consent; and this principle in American constitutional jurisprudence, is founded in natural equity, and is laid down by jurists as an acknowledged principle of universal law." In the case of the Tuckahoe Canal Company, Judge Tucker intimates the opinion that "the statute which invades the right should provide the remedy." 11th Leigh, 78. I am aware that there are authorities which incidentally treat the condition as an obligation upon the Legislature, yet countenance the idea that an Act authorizing seizures without any provision for compensation, may be constitutional. They devolve the obligation upon a future Legislature, and hold that Courts should not question the fidelity of that department. But if the duty to make the provision be more imperative upon one Legislature than another, it is upon that authorizing the seizure. If *it* may pretermit the obligation, which one shall certainly perform it? Shall it be the next succeeding Congress or the fifth or tenth thereafter? Would the owner, or would his heir-at-law be the recipient? Who can say? Meantime be it two years or twenty, his constitutional right will have been left in abeyance. His property will have been taken without compensation, and without provision for it, which is precisely what the Constitution forbids.

It is conceded that provision for compensation at some time is necessary to save the Constitution. But at *what* time? When will the measure of non-feasance be full, and the breach stand confessed? Is it not patent in every hour of indefinite postponement? Subsequent legislation may repair the private

Cunningham *vs.* Campbell *et al.*

wrong, but cannot cure the taint of the statute that author-
ized its infliction, nor expunge from history the recorded vio-
lation of the fundamental law. In our view the plea of
necessity which, in cases not provided for by law, might
afford agents of the Government personal indemnity against
uncompensated seizures, cannot sanction a deliberate act of
legislation by which the taking is commanded, and the remu-
nerative limitation ignored. In the Act to regulate impress-
ments it has not been ignored, but in a recent judicial opin-
ion the broad proposition I have discussed has been made a
postulate, whence it has been concluded, *a fortiori*, that it is
not the province of the judiciary to question the sufficiency
of the provision made in that Act.

I remark further, that when a duly appointed agent or
officer of the Government in the seizure of private property
adopts the provisions of an Act of Congress, authorizing im-
pressments, he will be held to proceed under that Act; and
the validity of his proceedings will depend, first, upon their
conformity to it, and secondly, upon its conformity to the
Constitution.

The fourth section of the Act in question provides that,
"whenever the Secretary of War shall be of opinion that
it is necessary to take private property for public use by rea-
son of the impracticability of procuring the same by purchase,
so as to accummulate supplies for the army or the good of
the service in any locality, he may by general order through
the proper subordinate officers, authorize such property to be
taken for the public use; *the compensation due the owner for
the same to be determined, and the value fixed as provided for
in the first and second sections of this Act.*"

Is this section of the Act conformable to the Constitution,
or is the impressment of supplies for the army allowable (as
some insist) only to meet its immediate, pressing wants? We
have shown that the words "nor shall private property be
taken for public use without just compensation," do not con-
template only cases of necessity in the strict sense of the
term—that by numerous authoritative adjudications, and
among others those of this Court they are held to include

cases of clear public utility.   Undoubtedly, as a general rule, the legitimate and proper mode of procuring supplies by the Government for the army as by an individual for his family and his employees, is by purchase.   But this may, and often does fail, and then, what other resource has the Government than impressment or forced purchase?   In this section Congress recognizes as a precedent fact the impracticability of obtaining supplies by purchase.   Provision cannot be made for armies such as modern warfare brings into the field, in a day or week ; often not at all in the immediate vicinity of an army.   There can be no clearer case of public utility than the accumulation of them in depots for future use.   To us it seems that the fourth section of the Act above quoted is a well guarded exercise of the power ; and it is to be regretted that its symmetry was impaired—(as will be seen hereafter), by a succeeding section.   By General Order, No. 37; issued April 6th, 1863, the Secretary of War recognizes the impracticability of procuring supplies by purchase, and orders impressments.   The correctness of his judgment we are not called upon to review.   It must, for the purposes of the case, be taken as correct.

But it is objected on the part of the defendants in error, that the seizure of their property, as set forth in the record, was violative of their constitutional rights, in that just compensation was not tendered them ; and in that the procedure, directed by the Act, and pursued by the officer, is not adapted to the ascertainment of just compensation.

On the first point, the evidence is, that the compensation tendered for the sugar was seventy-five cents per pound—that the owners paid for it one dollar per pound, and that it "*was worth*," on the day of seizure, one dollar twenty to one dollar twenty-five per pound.   There was no conflicting evidence. If then "just compensation" means a fair equivalent—the value or worth of the thing seized—in money, it is fully established that in this case just compensation was not tendered.

Were this the whole case, certain questions which have been pressed upon our consideration with great earnestness and force, would be highly pertinent.   We have been asked,

Cunningham *vs.* Campbell *et al.*

will the Courts in all cases arrest the process of impressment, at the instance of the owner, to try the issue of fact whether or not just compensation has been tendered? Will they review the finding of the tribunal instituted to ascertain that fact? Will they make the validity of the Act dependent upon the correct or incorrect judgment of the triers of value in each particular case? No case has come before this Court, resting upon that isolated ground, and therefore upon it no judgment has been rendered. There is, however, much force in the proposition that if a statute authorizing impressment provide a scheme adapted to the ascertainment of value, combining fairness and practicability, the awards made under it should be subject to review only by petition of the citizen to the Department of Government, holding the purse-strings, that so important a proceeding should not lightly be subjected to the delays of litigation. Full and exact justice in every particular case should not be made the test of lawful or constitutional authority. Approximation to it is all that is certainly attainable under imperfect human institutions; probably in a majority of cases, no more is attained by jury trial, with the corrective appliances of new trial and appeal. The evidence of inadequate compensation has been made a part of this record, and the propriety of considering it consistently with the view I have just expressed, will hereafter appear.

But if a provision of an Act of Congress for impressment, professedly conforming to the limitation of the Constitution, but flagrantly unadapted to the ascertainment of value, and practically tending to a very different result, be beyond the reach of the judiciary, there is manifest danger that the limitation will be evaded, and the power itself perverted. In such a case the citizen is entitled to be heard, and the Constitution enjoins its own vindication.

Much has been said, and eloquently said, of the imperiled condition of the country, and the fatal consequences likely to result from judicial interference with the *war* measures of the Government; but let it be remembered that by a provision of the instrument itself, Judges as well as legislators, are sworn " to support the Constitution ;" and this they are

to do in war, as well as in peace.    We yield to none in respect
for the Congress of the Confederate States ; we would at all
times, and especially in times like the present, most reluc-
tantly dissent from their construction of the Constitution ;
we would, in cases of doubtful meaning, incline to give them
the benefit of the doubt, for the safety of the country.    Be-
yond this point of concession, not even war, with its atten-
dant horrors, may rightfully impel the judiciary.    Positive
conviction of constitutional obligation may not be yielded
under any circumstances.

We come now to the consideration of that portion of the
Act by which the measure of compensation in this case was
reached.    This is a proceeding authorized by the fourth section,
of which we have spoken approvingly.    It will be observed that
the last clause directs that " the compensation due the owner
be determined, and the *value* fixed, as provided in the first
and second sections of this Act."    The first section provides
that whenever the owner of property and the impressing
officer cannot agree upon the value thereof, the latter shall
cause the same to be ascertained and determined by the judg-
ment of two loyal and disinterested citizens of the vicinage ;
one to be selected by the owner, one by the impressing officer,
and in case of disagreement, these two to choose an umpire of
like qualifications, whose decisions shall be final.    This scheme
is by the terms of the first section limited to seizures of proper-
ty in the hands of producers.    There is no such limitation
in the fourth section, but unfortunately, this just and equita-
ble scheme is modified by the fifth and sixth sections, as ap-
plied to persons other than producers.

It is therein provided, that in all cases, compensation for
property impressed in the hands of purchasers, who hold it
for re-sale, is to be determined by reference to a schedule of
prices for all articles, made and published, to govern for a
fixed future period, not exceeding sixty days, by two com-
missioners, appointed for each State, one by the President of
the Confederate States, and one by the Governor of the State.
This is the scheme of assessment applicable to, and actually
applied in, the case at bar.

It will be conceded that just compensation is an equivalent—the fair value in money. It is not any price which the owner may demand; it is not a price fixed by holders in conspiracy, not yet attained in commercial transactions; but which in the spirit of speculation they resolve to realize in the future, or force in the present, from the necessities of the Government. Against all such exactions and conspiracies impressment is a rightful remedy, and the just compensation which the Constitution has made inseparable from it, is the value which impartial, intelligent, honest appraisers, in view of the article impressed, at the time and place of impressment, shall assess upon it.

The impressment authorized by the Constitution, is not designed to cheapen commodities for the Government, but to ensure supplies at fair prices. Unless the Government pay prices which citizen consumers pay, the result will be that it levies contributions from one portion of the people in support of the war, from which all others escape. The difference in price paid by the citizen, on purchase, to one dealer, and the price paid by the Government on impressment, to another, will be the measure of contribution unjustly wrested from the latter.

We inquire now how the schedule scheme of the fifth section operates—whether it be reliable for the ascertainment of values.

The value of property of the same kind and quality, is not the same in all places at one time. Yet the schedule arranged is operative during a specified time in all places, within a large district—as a State, or one half of a State.

Again, the value of commodities of like kind and quality, is not the same in the same place, at different times. The fact is notorious that it varies often within a month, or even a week, in ordinary times. It is feelingly impressed on the class of consumers who produce none of the necessaries of life, that in these times, values have no more sameness for a week than has the disc of the moon. Yet the commissioners in their arbitrary discretion arrange a schedule of prices to rule for twenty, forty, or sixty days.

It is equally untrue, and unphilosophical to say that these fluctuations are produced by speculative operations. These may at times exert an influence, meriting resistance,, but surely fair, contemporaneous appraisement is potent enough to overcome that. There are other and controlling causes at work, which legislation cannot arrest, and should not seek to evade. They are the existing relation between demand and supply, and the proportion which the volume ·of currency bears to the real and commercial interest of the community. Yet, unaffected by such considerations, the schedule establishes prices, which the Act says, shall represent values for sixty days to come. Of two merchants separated only by a wall, both purchasing articles of like kind and quality, at the same price on the same day; each placing upon his commodity, for re-sale, the same price, yielding only a fair profit; one sells to a citizen and receives but just compensation; the other falls into the hands of the impressing officer, who, schedule in hand, backed by the power of the Government, pays him but half the profit realized by his neighbor—perhaps none at all—perhaps (as in the case at bar) sends him with his entry to the opposite side of his profit and loss account. Has this last received just compensation? Scarcely. Why not? Has the impressing agent dealt unconscientiously with him? Not at all; he has but obeyed orders. Then—again, why not? Because the law bound the officer by a scheme, the working of which, unaffected by time or circumstances, led arbitrarily to the result. I say arbitrarily, because the schedule is arranged by men who do not, and cannot know the elements that will operate to adjust values in the future, which they are required to invade. It would seem to be a self-evident proposition, that such a scheme can have no adaptation to the rendition of just compensation, unless it can· regulate values, as well as prices. That legislation cannot do this, the principles of political economy, based upon observations carefully made, and collated, in the course of time, warrant us in affirming. But let the experience of the hour, as set forth in the record, speak. Whilst the Government pays its schedule price for an article, at the same

time and place, the citizen, (not the prodigal only, but the frugal and even the miserly) pays for its like, fifty, perhaps one hundred per cent more.   And this he pays, because, looking to the circumstances surrounding buyer and seller, it is the value.   This is a truism, which argument cannot strengthen, nor sophistry elude.

The conclusion then is, that this Government schedule neither regulates nor ascertains values.   It regulates prices, in a certain class of transactions, wherein property changes owners, those to which the Government is a party; and just so far as values rise above the prices of regulation, does it fall below the ascertainment of just compensation.   Did the clause of the Constitution read thus, "private property shall not be taken for public use, except at prices fixed by authority of the Congress," the grant of power would not more than cover the scheme we are considering.   Can that scheme be said then, to satisfy the condition, without just compensation ?

We must not omit the consideration, that this Congressional scheme is intended to cover the whole ground—to couple with the seizure, final compensation—to close forever, at the time of impressment, as between the Government and the owner, the transaction of forced purchase.   The Act provides no after recourse, and if the proceeding be allowed to go forward, when its force shall have been spent, there remains to him no claim of legal right.   If he ask more it must be, *ex gratia.* This, in our view, imposes upon the judiciary, when appealed to, the obligation to scrutinize the Act in question—to inquire, not whether the scheme provided is the best possible for the ascertainment of value, but whether its practical operation tends with reasonable certainty to that end.

The result of that inquiry, in the present case, is that the proven tender of the price fixed in the schedule exhibited, does not raise even legal presumption of the tender of "just compensation."   There remained a bare possibility that, in this case, an accidental concurrence of the two existed.   If so, in the absence of legal presumption, affirmative proof of the fact should have been made.   Not only was this too

wanting, but the record discloses that the price tendered was some forty per cent. short of the "worth" of the property when seized, and consequently of just compensation. Such has been the result in two cases which have come before us. Indeed it cannot well be otherwise, and we trace it directly to the non-conformity of the scheme embodied in the fifth section of the Act, to the constitutional limitation of the power. The latter, we repeat, in our opinion, can only be satisfied, where a disagreement as to compensation occurs, by a valuation of the property, at the time and place of impressment, by appraisers fairly and impartially appointed.

The plaintiff in error incorporated, in his return to the writ of *habeas corpus*, a plea in the nature of a demurrer to the sufficiency of the remedy adopted in this case. It is substantially this, that the defendant, being a ministerial officer, and having the authority of law for the seizure of the goods, the subject of contest, his possession is legal and peaceable, and therefore cannot be divested by the summary process of a possessory warrant.

The affidavit of the promovant which was the foundation of the proceeding, avers that on a given day he was in the peaceable and legally acquired possession of the property in dispute, and that it was taken, under some pretended claim, from his possession, by the defendant, by force, and without lawful warrant or authority. This, under the 3932 section of the Code, authorized the issue of the warrant, or in other words, gave to the Judge jurisdiction of the case, in this form of proceeding. Nevertheless, if upon the hearing it appeared, either that the promovant never had the legally, and peaceably acquired possession of the property, or that it had been taken from his possession, by lawful warrant or authority, he would not have been entitled to the restoration of his possession. It is not denied that at the time stated he did have legally and peaceably acquired possession. The question turns upon the legality of the proceeding by which that possession was divested. It was certainly effected by force or violence, because the property was removed without the consent of the possessor. Had, then, the party removing

Cunningham *vs.* Campbell *et al.*

and retaining it lawful warrant or authority for his act ? To this point the question is narrowed. The warrant was the order of the Chief Commissary for the State of Georgia, addressed to an Assistant Commissary. The Act to regulate impressments, is relied upon to establish the lawfulness of this warrant, or rather the fifth and sixth sections of that Act. We have held that those sections of the Act violate the Constitution, and are therefore void. Strike them out, and the order issued by the Commissary is not a lawful warrant; the proceeding of the officer seizing, is without lawful warrant and authority; his possession is neither legal nor peaceable, and we are thrown back upon the prior possession of the promovant which was both legal and peaceable. The judgment of the Court, therefore, was in accordance with section 3935, which is directory in that regard.

It will be observed that there is nothing penal in the judgment. The law does not contemplate it. Its object is different, viz: to secure the mere right of possession against unauthorized invasion. If this decision should appear to be in conflict with certain common law authorities which have been cited we have only to add that it is a statutory proceeding; and in this country, as in England, not only common law remedies, but common law rights, are every year modified by statute. To us it appears that the proceeding and the judgment conform strictly to the Code. When we speak of the judgment, we mean only that portion of it which directs the restoration of the property—so much of it, as is in the alternative, we think erroneous, because the statute of impressment does not authorize the officer to assess the value of the articles impressed in this case, in any other way than that pursued by him. With this exception we affirm the judgment of the Court below.

Let the judgment be affirmed.